PBOVOSTY, J.
This suit is brought by the brother and the sister of the late A. C. Hutchinson to annul the following provision of his will:
“After the above named gifts and bequests may have been paid or provided for, subject to such codicils as I may hereafter make or add to this will and for which due provision shall be made, I give the balance of my estate, real and personal, to the Tulane University of Louisiana, for the sole and exclusive benefit of its Medical Department; the abject of this bequest is to create a fund to be used in increasing the efficiency of the Medical Department of the Tulane University of Louisiana, as a Medical School, and to contribute to its usefulness and beneficence in ministering t<3 the ailments, injuries and other physical infirmities of the suffering and *659 destitute poor of all races, ages, sexes and nationalities.
“In the furtherance of the purpose of this bequest, the fund thus created is to be used by the Administrators of the Tulane University, under the direction and supervision of the University’s Medical Faculty, for the purchase of ground and erection of suitable buildings in connection with and in the immediate vicinity of the building now designated as the Richardson Memorial, and officially known as the University of Louisiana. The aforesaid grounds and buildings to be used in the establishment of a free clinic or dispensary, and for a hospital to include in its wards such a number of free beds (also for the destitute poor) as in the judgment of the Faculty may be available within the limitations of this fund.
“It is contemplated, in making this bequest, that suitable provisions will be made by the Faculty and Administrators to improve all the opportunities for the study of the nature, prevention and cure of disease by the establishment of clinical and other laboratories as may be available out of this fund, in pursuance of its philanthropic object.
“It is also recommended that a part of the fund thus created shall be reserved for investment and interest in such wise as to insure the maintenance of a free clinic until such time when this provision may, in the judgment of the Faculty and Administrators, be deemed unnecessary. This reserve fund shall then be utilized or expended in extending the hospital plant by creating new departments or new buildings as these may be needed to promote the charitable and educational purpose of the bequest.”
The grounds of nullity are stated in plaintiffs’ brief, as follows:
“(1) The tenure attempted to be created is one not known to the law of Louisiana. Perfect ownership is not vested by the terms of the will in Tulane University or its administrators; neither the university nor its administrators has the power to control, administer, or dispose of the legacy; and the provision in question purports the' substitution or fidei commissum prohibited by law.
“(2) Neither the Tulane University, nor its administrators, nor the Tulane Educational Fund has the corporate right, power, authority, or capacity to receive the legacy, and to hold, use, expend, or administer the same for any of the purposes specified in the will; such purposes being outside of and beyond the powers delegated by law to any of said persons.
“(3) The power of the Tulane University to receive the legacy for the purposes specified in the will is contrary to and forbidden by law,. and particularly by an act of the General Assembly entitled ‘An act to incorporate the Faculty of the Medical College of Louisiana,’ apx>roved April 2, 1835 [Acts 1835, p. 221]; and .said university cannot, either as the successor of the Faculty of the Medical College of Louisiana, or as person interposed in place of the intended beneficiary, its medical department, take or receive said bequest.” The defendants are the executors under the will and Tulane University.
We shall follow the example of counsel, and discuss these grounds in their inverse order.
1. Has Tulane University the capacity to receive a bequest for the benefit of its medical department?
That it has such capacity with respect to all of its departments except the medical is not denied; but the contention is that the medical department is a distinct corporation from the university, and not simply one of its departments, and that this separate corporation is x^rohibited by law to receive donations mortis causa, and cannot receive them indirectly through the medium of the university; that when the university was organized 'there had already been created by *661 the Legislature a private corporation under the name of “The Faculty of the Medical College of Louisiana,” and that this private ■corporation was joined to the university as its medical department; and that it has continued to retain its individuality, with the •same powers and the same disabilities, and among the latter the inhibition against receiving donations mortis causa.
Per contra, defendants contend that this private corporation was never united to or Incorporated into the university, but that what was adopted into the university by Act No. 49, p. 39, of 1847, creating the university, was merely the school which this private corporation had established and had brought to a flourishing condition, and which, if not adopted into the university, would have stood in rivalry with the medical ■department of the university.
This idea of the binary character of Tulane University thus advanced by plaintiffs must have come as a surprise to the authorities of the university, as it did to the members of this court, all more or less acquainted with the history of the charter of the university. Perhaps a sufficient refutation of it might be found in the mere reading of some of the provisions of the charter of the university; but in view of the earnestness, ■and, we must say, the consummate ingenuity, with which the point is pressed, and also in view of the importance of the interests involved, we deem it advisable to give the ■question the same treatment it would be entitled to if less free from doubt.
The voluminousness of the matter to be handled makes subdivision advisable. We shall give first, in as comx)endious form as consistent with completeness of statement, the charters (all legislative) of the corporations in question — of this private corporation, the Faculty of the Medical College of Louisiana, of the University of Louisiana, and of Tulane — together with all constitutional and legislative enactments bearing upon these corporations. Then we shall state, as far as may be derived from the record, the manner in which that legislation was interpreted and carried out by the parties in interest. Lastly, we shall come to the discussion proper.
Charters and Other Legislation.
In 1835 the Legislature adopted an act entitled “An act to incorporate the Faculty of the Medical College of Louisiana and the Medical College of Orleans.”
The preamble of the act recites that seven certain physicians, naming them, have associated themselves together and taken measures for the establishment of a medical college in the city of New Orleans.
Section 1 constitutes these same seven physicians a body corporate under the name of the “Faculty of the Medical College of Louisiana,” with perpetual succession and a common seal.
The second section authorizes the corporation to organize and establish a medical college under the name of the “Medical College of Louisiana,” to create such professorships as they may deem expedient, and to confer medical degrees under such regulations as they may make.
By section 3 every person elected to a professorship becomes a member of the corporation, with the same rights and privileges as the original incorporators.
By section 4 authority is given to make regulations for the election and dismissal of professors, with the proviso that a four-fifths vote should be required for the election or dismissal of a professor.
By section 5 authority is given to take and hold property, real or personal, by every kind of title, except by bequest, for the use and purposes of the corporation, but not otherwise; to sell and dispose of the same; to sue and be sued; to make rules and by-laws for the government of the college by the vote of two-tliirds of the faculty.
*663 By the sixth section a board of trustees for the corporation is established, composed of the Governor, the Judges of the Supreme Court, and nine other persons, with power to fill vacancies, whose duty it should be “to watch over and superintend the interests of the institution, to receive all sums of money bestowed on it by way of endowment or otherwise, and to invest the same for the benefit of the institution.”
By the seventh section it is declared that the act should be in force for 30 years.
Act No. 62, p. 38, of 1843, entitled “An act to amend an act entitled ‘An act to incorporate the Faculty of the Medical College of Louisiana,’ ” provided, in substance, as follows:
Section 1: That for 10 years thereafter the members of the faculty of this medical college should, without compensation, discharge the duties of attending physicians and surgeons at the Charity Hospital, such persons being approved by the administrators of the hospital; the right of other physicians to attend the hospital not being affected.
Section 2: That the medical and surgical attendance so to be given by said faculty should be equal and similar to that theretofore required, and that the faculty should submit themselves to the rules and regulations of the hospital.
Section 3: That the faculty should give free instruction to an indigent student from each parish of the state, to be recommended by the Senator and the Representatives.
Section 4: That in consideration of the services aforesaid 124 feet square of that vacant square in the city of New Orleans belonging to the state be leased for 10 years to the Medical College of Louisiana, and that said 120 -feet should be measured from the corner of Common and Philippa (now University Place) streets, and that at the end of the 10 years the buildings thereon should become the property of the state.
Section 5: That the Governor should make and sign the lease.
The medical school thus provided for was fully established and in a flourishing condition when the Constitution of 1845 was adopted, containing the following provisions:
“Art. 137. A university shall be established in the city of New Orleans. It shall be composed of four faculties, to-wit: one of law, one of medicine, one of the natural sciences, and one of letters.
“Art. 138. It shall be called the ‘University of Louisiana,’ and the Medical College of Louisiana, as at present organized shall constitute the faculty of medicine.
“Art. 139. The Legislature shall provide by law for its further organization and government; but shall be under no obligation to contribute to the establishment and support of said university by appropriations.”
In obedience to this mandate, the Legislature of 1847 adopted Act No. 49, entitled “An act to establish in the city of New Orleans the University of Louisiana.”
The first section provides for the constitution of a board of administrators of the university, composed of the Governor, the mayor of New Orleans, the Chief Justice, and 13 persons appointed by the Governor with the consent of the Senate.
The second section declares that the administrators and their successors “shall be and forever remain a body politic and corporate, in fact and name, by the style of the Administrators of the University of Louisiana,” with power to sue and be sued, to have a common seal, “to take by purchase, gift, grant, devise and donations inter vivos and mortis causa, made by individuals and corporations within this state or elsewhere, and in any manner to hold any real or personal property whatsoever.”
The third section provides that said university “shall be composed of the following departments or faculties, to-wit: One of *665 law, one of medicine, one of the natural sciences, and one of letters, and a college proper or academical department; all of which said faculties’ as the resources of the university increase, shall be completed by the said administrators, excepting the medical department, which shall be composed of and formed by the Medical College of Louisiana, as it is at present organized and established by law, which said department, as is hereinafter provided for, shall be engrafted on said University, and be conducted in manner as shall be hereinafter directed.”
Section 4 gives the administrators “full power to direct and prescribe the course of study and discipline to be observed in the university”; to elect a president; to name and appoint all other professors and teachers, who are to be removable at their pleasure; to fix salaries of the president and in the academical department; and to fill all vacancies in professorships, providing “that vacancies in the law or medical departments shall be filled from persons first recommended to the administrators by the respective faculties of these departments in which a vacancy may happen.”
The fifth section prescribes a quorum of five for ordinary business, and a quorum of nine for appointing or removing a professor.
Section C provides for the naming of a chairman of the administrators.
Section 7 provides for filling vacancies among the administrators.
Section 8 gives authority to make all bylaws and ordinances to govern the university, excluding all religious texts and tenets.
Section 9 gives the board power to confer all degrees including bachelor at law and doctor of medicine.
Section 10 provides how diplomas shall be signed.
Section 11 grants the board ample powers for the government of the university “under such restrictions only as are herein specified,” to fix the number of professors and tutors, and to increase or diminish their number, “provided that in the medical department there shall never be less than seven professors, which number shall be increased only at the suggestion and recommendation of the faculty of .that department.”
Section 12 gives the board power to establish and regulate a primary department or grammar school, and power “to attach to the university such other institutions, literary or scientific societies, schools and professorships as to them may seem advisable, all of which, so "far as relates to instruction, shall be under the control of the board of administrators.”
Section 13 regulates the sessions of the schools of the university.
Section 14 gives each student a right of examination and certificate in sch'ools in which he has studied.
Section 15 provides for a commencement day.
Section 16 provides for appointment of a secretary and treasurer.
Section 17 retains for the Legislature power of visitation and of repeal of charter.
Section 18 prohibits an administrator from acting as such, or as professor, or tutor, of any other school or college in the state.
Section 19 provides, as follows:
“That all of the real and personal estate whatsoever, or in any wise belonging to the Medical Oollege of Louisiana, be and the same is hereby transferred to and vested in the University of Louisiana: provided the administrators of said university appropriate the sum which the real and personal estate of said Medical Oollege cost, to the purchase of philosophical and chemical apparatus for the use of said college, and that said medical school, as it now is organized, is herein and hereby incorporated with and made part of said University of Louisiana; and that said Medical Oollege as it is now established by law, shall constitute the only medical department of said university; and the professors *667 now filling the chairs in said school, shall constitute the medical faculty of the department of medicine of the university and fill the same chairs in "the university now filled hy them in the Medical School of Louisiana; and hereafter be under the government of the board of administrators of the university: provided, that in the requisites for admission, the examining the candidates for their degrees in said medical department, and the law department, the management of pecuniary concerns, the salaries of the professors, and the price of tuition and terms of admission, shall be under the exclusive control of the faculty of said departments respectively.”
Section 20 provides:
“That the department of law shall consist of three or more professors to be appointed by the administrators, who shall be required to give a full course of lectures on international, constitutional, maritime, commercial and municipal or civil law, and instruction in the practice thereof, to be regulated among themselves by the designating the chairs or professorships, and prescribing the course to be taught by each; and whose salaries shall be paid by the money received for admission to their lectures; and said department to be regulated by the faculty of law, in the same manner and to the same extent as provided in the foregoing section for the medical department of the university.”
Section 21 gives the faculties the right to admit indigent students free of charge.
Section 22 gives the medical department at all times free access to the Charity Hospital for the purpose of affording their students practical illustrations of the subjects they teach.
Section 23 regulates admissions to the academical departments.
Section 24 exempts students and professors from jury duty.
At the same session of 1847 (Acts 1847, p. 105) the Legislature adopted Act No. 147, entitled “An act to provide for the erection of the buildings necessary for the University of Louisiana.”
Section 1 approves the plan of the buildings drawn by James Dalnh.
Section 2 appropriates to the use of the-university the half square owned by the state bounded by Common, Baronne, and Philipa, and Canal streets.
Section 3 appropriates $25,000, in two installments, for the immediate erection of the-entire building as designed in Dakin’s plan.
Section 4 provides that “the said appropriation shall be paid to the dean of the Medical College of Louisiana, the first installment as soon as the faculty of the Medical College of Louisiana shall execute and deliver a deed conveying all their rights, title, and interest in and to the building erected by them, and used for the Medical College, on the lot aforesaid, to the president of the board of administrators of the University of Louisiana, who is thereby authorized and directed to accept the same for the use and benefit of the said University; and the second installment to be paid on January 1st, .1848, provided the entire building is then-completed.”
In 1848 (Acts 1S48, p. 79) the Legislature passed another act — No. lOih-making an appropriation for the University of Louisiana.
Section 1 appropriates $35,000 for the purpose of completing the building then in progress, for creating other buildings, and procuring the necessary books and apparatus, prohibiting any portion of the money to be paid to officers or professors, and conserving the right of the university to the unexpended balance of the previous appropriation, amounting then to $12,500, for the use of the medical department.
Section 2 makes it the duty of the board of administrators to complete the building of the medical department according to the plan theretofore submitted to the Legislature and in part executed.
In 1850 (Acts 1850, p. 189) the Legislature *669 adopted. Act No. 239, entitled “An act for the advancement of medical education in Louisiana.”
By section 1, $25,000 was appropriated to buy anatomical, surgical, medical, obstetrical, physiological, pathological, pharmaceutical, chemical, and philosophical apparatus and preparations for the use of the medical department of the University of Louisiana.
By section 2 said appropriation was to be paid in two installments for the said purposes to the president of the board of administrators of the University of Louisiana.
By section 3 the board of administrators was directed to appoint one or more professors of the medical department, on the recommendation of the medical faculty, to purchase the articles described in the first section, and to defray the necessary expenses out of the sum appropriated.
By section 4 the dean of the medical department was required to make a catalogue of the articles purchased, and to furnish copies of the same to the Legislature and to the board of administrators of the University; and also to make to the Legislature and to the board of administrators a detailed report of the expenditures, under the act.
In 1853 (Acts 1853, p. 173) the Legislature adopted Act No. 215, entitled “An act to more effectually carry into effect an act entitled ‘An act for the advancement of medical 'education in Louisiana,’ ” approved 21st March, 1850.
By this act the sum of $6,000 additional was appropriated for the purpose of carrying into effect the act of 1850, under the proviso that for 10 years thereafter “the institution shall gratuitously instruct an indigent student from each parish in the state to be named by the police jury.”
By Act No. 137, p. 192, of 1855, certain persons were appointed a commission to superase the completion of the university buildings, and the erection of a suitable iron fence to inclose the grounds of the university. An appropriation of $13,500 was made to that end.
13y Act No. 320, p. 417, of 1855, entitled “An act relative to the University of Louisiana,” the above Act No. 49, p. 39, of 1847, was re-enacted with the following modifications:
Section 10 and 11 were consolidated, and the first part of section 11 was omitted, evidently because the subject thereof — the full power to govern and control the university — was already provided for in other sections.
To section 20 of the act of 1855, corresponding to section 21 of the act of 1847, was added the obligation on the medical department, imposed by the act of 1853, of educating for 10 years from 1853 a student from each parish.
There was also added a new section containing a sweeping repealing clause, which clause was absent from the act of 1847. That repealing clause is in these words:
“That all laws contrary to the provisions of this act, and all laws upon the same subject-matter, except what is contained in the Civil Code and Code of Practice, be repealed.”
By Act No. 122, p. 106, of 1857, an appropriation of $12,500 was made, and ordered to be paid to the president of the board of administrators of the university, “for the purpose of making the necessary repairs and alterations on the buildings of the Medical College of the University of Louisiana, the property of the state.”
The Constitution of 1852 contained the following articles:
“Art. 139. The University of Louisiana in New Orleans, as now established, shall be maintained.
“Art. 140. The Legislature shall have power to pass such laws as may be necessary for the further regulation of the university, and for the promotion of literature and science; but shall be under no obligation to *671 contribute to the support of said university by appropriations.”
By Act No. 81, p. 54, of 1860, the first section of Act No. 320 of 1855 was amended so as to change the number and mode of appointment of the board of administrators of the university.
By Act No. 233, p. 181, of 1861, the board of administrators were instructed to turn over to the medical department of the University of Louisiana the east wing of the university buildings, until otherwise ordered by the Legislature.
The Constitution of 1864 contained this article:
“Art. 143. A university shall be established in the city of New Orleans. It shall be composed of four faculties, to-wit: One of law, one of medicine, one of the natural sciences, and one of letters; the Legislature shall provide by law for its organization and maintenance.”
The Constitution of 1868, in article 142, repeated the exact language of the Constitution of 1864, and added a proviso prohibiting discrimination against matriculants on account of race or condition.
The Constitution of 1879 contained this article:
“Art. 230. The University of Louisiana, as at present established and located at New Orleans, is hereby recognized in its three departments, to-wit: the law, the medical, and the academical departments, to be governed and controlled by appropriate faculties.
“The General Assembly shall, from time to time, make such provision for the proper government, maintenance and support of said State University of Louisiana, and all the departments thereof, as the public necessities and well-being of the people of the state of Louisiana may require, not to exceed ten thousand dollars annually.”
In the revision of the statutes of 1870, the act of 1855, as amended by the Acts of 1860 and 1861, save and except the repealing clause, which was then immaterial, was reenacted, and made sections 1351 to 1374 of the Revised Statutes.
Such was the condition of the law relative to the University of Louisiana when the Legislature in 1884 adopted Act 43, p. 48, of that year, the preamble of which is as follows:
“Whereas, Paul Tulane, Esq., formerly a resident of this state, and now of Princeton, New Jersey, with the beneficent purpose of fostering higher education in this state, did, in May, 1882, express to certain citizens of this state his intention to donate for such purposes valuable real estate to him belonging, situate in the city of New Orleans; and
“Whereas, the citizens to whom the intentions of Paul Tulane, Esq., were expressed did, by act, before Ohas. G. Andry, a notary public in the city of New Orleans, organize-themselves into a corporation, under the name of the ‘Administrators of the Tulane Education Fund,’ with the objects and purposes specified in said act of incorporation; and
“Whereas, since the formation of said corporation, Paul Tulane, Esq., in the execution of. his previously expressed intentions, has donated to said administrators of the ‘Tulane Education Fund’ nearly one million dollars, the revenues whereof are to be used for the promotion and encouragement of intellectual, moral and industrial education, and has expressed his intention to largely increase said donation should this act be adopted; and
“Whereas, the said Board of Administrators of the ‘Tulane Educational Fund,’ in order to make their work fruitful in results, have expressed their desire to take charge of the University of Louisiana, in the city of New Orleans, and to devote the revenues of. the property now owned, or hereafter to be owned, by said board, to its expansion and development; and upon the' adoption of a constitutional amendment to that end, to ap *673 ply all the revenues of property now owned, or hereafter to be acquired by them, to the creation and development in the city of New Orleans of a great university, whereby the blessings of higher education, intellectual, moral and industrial, may be given to the youth of this state; and
“Whereas, under the terms of this action, as proposed by said board, the property of said board and the revenues thereof, will not be used for purposes of private or corporate income or profit, but will be exclusively dedicated to school' purposes, and to the service of the state in maintaining and developing the University of Louisiana, an institution recognized in the Constitution, therefore entitling the said property of said board to exemption from all taxation, both state, parochial and municipal; therefore,
“Be it enacted,” etc.
The title of the act reads as follows:
“An Act
“To foster, maintain and develop the University of Louisiana, to that end to make the Board of Administrators of the Tulane Education Fund, as presently constituted, with the addition of the Governor, Superintendent of Public Education, and Mayor of the City of New Orleans, as ex officio members thereof the administrators of the University of Louisiana, which shall hereafter be known as the ‘Tulane University of Louisiana,’ to invest said Tulane Board with all the powers, privileges, franchises and immunities now vested in the Board of Administrators of the University of Louisiana; and with such other powers as may be necessary or pertinent to develop, control, foster and maintain it as a great university in the city of New Orleans. To give to the Administrators of the Tulane Education Fund the control, management and use of all the property of the University of Louisiana, in the city of New Orleans, for the purposes aforesaid; to exempt, In consequence Of the terms of this act, and the dedication of its revenues to the purposes stated in this act, all the property, real and personal, present and future, of the said Board of Administrators of the Tulane Education Fund, from all taxation, whether state, parochial or municipal; to make a contract, irrevocable and conclusive, between the state and the Administrators of the Tulane Education Fund, covering the provisions of this act; to enable the said Board of Administrators of the ‘Tulane Educational Fund’ to decline to accept the provisions of this act, unless the same, in all its provisions, be ratified and approved by a constitutional amendment, to be submitted at the next general election; to give said Board of Administrators of the ‘Tulane Educational Fund,’ upon the adoption of said constitutional amendment, not only the full powers of administration over the University of Louisiana conferred by this act, but also the power to create, develop and maintain a great university in the city of New Orleans, which university so to be created shall perpetually be under their full and complete control; to enable said board, should they act under the provisions of this act, pending the submission of said constitutional amendment, to withdraw and relieve themselves from all the effects of said action should said proposed constitutional amendment be rejected, and to provide for the submission of a constitutional amendment ratifying the provisions of this act, to the people of the state at the next general election.”
The body of the act provides, in substance, as follows:
Section 1 constitutes the Tulane Board the Board of Administrators of the University of Louisiana, with power perpetually to fill any vacancy in their number.
Section 2 gives the Tulane Board, in their capacity as administrators of the university of Louisiana, all the rights, powers, etc., now vested by existing laws in said Board of Administrators of the University of Louis *675 iana. It further provides “that they shall further have full direction, control and administration of the University of Louisiana, now established in the city of New Orleans, in all its departments,” etc. The other provisions of the section are not material to the issue in this case.
Section 3 gives the Tulane Board perpetually, as administrators of the University of Louisiana, “full and complete control of all the property and rights now vested in the University of Louisiana.” These powers are given it in addition to those possessed in its ¡private act of incorporation.
Section 4 changes the name of the university to “Tulane University of Louisiana,” under which name “it shall possess all the powers, privileges, immunities and franchises now vested in said University of Louisiana, as well as such powers as may flow from this act, or may be vested in said hoard under the terms of this act, from the adoption of the constitutional amendment hereinafter referred to. The purpose of this act being to invest the board of administrators with all the rights now vested in the University of Louisiana: to give said board, moreover complete control of said university in all its departments and in every respect, with all powers necessary or incidental to the exercise of said control; to enable said board, besides the powers designated by this act, to have irrevocably, upon the adoption of said constitutional amendment, full power, with the rights hereby conferred, to create and develop a great university in the city of New Orleans, to be named as aforesaid.”
Section 5 exempts all the property of the Tulane Educational Fund from taxation in consideration of its obligation to devote all its revenues to develop and maintain the University of Louisiana.
Section 6 obligates the Tulane Board, in consideration of the exemption of its property, present and future, from all taxation, and of the investing in it the administration of the University of Louisiana, to devota all its revenues to the development, fostering, and maintaining the Tulane University, and upon the adoption of the proposed constitutional amendment “to perpetually use the powers conferred by .this act, and all powers vested in them, for the purpose of creating and maintaining in the city of New Orleans a great university, devoted to the intellectual, moral and industrial education and advancement of the youth of this state, under the terms of the donation of Paul Tulane, and the previous provisions of this act.”
Section 7 declares the act in all its provisions to be a contract between the state and the “Administrators of the Tulane Education Fund.”
Section 8 submits the act in all its terms, provisions, and stipulations for ratification at the next general election as a constitutional amendment.
Section 9 provides for the execution of the act pending the submission of the constitutional amendment.
Section 10 repeals Certain designated sections of the Revised Statutes: 1357 referring to filling vacancies in board of administrators and fixing formalities of their meetings; 1302 referring to sessions of the university and certain requirements of study by students ; 1363 referring to right of student to attend selected studies and to be examined therein; 1365 referring to secretary and treasurer of board of administrators; 1366 referring to legislative right of visitation and repeal; 1367 prohibiting administrator from acting as trustee, etc., or holding position in any other school or college; 1370 relative to admission of free students by faculties of the University; 1372 referring to admission of students in academical department on examination by faculty; 1373 exempting students and professors from militia and jury duty; 1374 referring to tenure of east wing of university building by medical faculty. It forever repeals “all laws and parts of *677 laws, conflicting m any manner with the terms of this act.”
Sections 11 and 12 provide the formalities for the submission and voting for the act as a constitutional amendment.
The law under which the Administrators of the Tulane Educational Fund organized themselves into a corporation is section 681 of the Revised Statutes, which reads as follows:
“Such corporation shall be capable in law, according to the terms and conditions upon which said corporations are formed and established, to take, receive and hold all manner of land, tenements, rents and hereditaments, and any sum of money, and any manner and portion of goods and chattels given and bequeathed unto them or acquired by them in any manner, respectively: to be employed and disposed of according to the objects, articles and -conditions of the instrument upon which the corporations respectively are formed and established, or according to their articles and by-laws, or of the will and intention of the donors.”
The act of incorporation virtually follows this law in the matter of the powers conferred upon the corporation.
The constitutional amendment in question was duly adopted.
Our present Constitution, adopted in 1898, contains the following (article 255):
“The Tulane University of Louisiana, located in New Orleans, is hereby recognized as created and to be developed in accordance with the provisions of Legislative Act No. 43, approved July 5, 1884, and by approval of the electors, made part of the constitution of the state.”
Interpretation by Parties in Interest.
It seems to us that the records of the university and those of the private corporation the Faculty of the Medical College of Louisiana, if still extant, ought to show whether it was the private corporation or merely its school that was embodied in the university. But these records are not produced, and no point is made by either party on the fact of their nonproduction. The embodying of this private corporation or of its school into the university brought no chauge to the outward appearance of the school. The same professors continued to have charge of it and to manage its pecuniary affairs, with the sole difference that they did so in their quality of incorporators if what was embodied into the university was the corporation, and in their quality of mere members of the medical faculty of the university if what was embodied in the university was merely the school without the corporation.
In the absence of the minutes of the corporations, and of all testimony on the subject, the only outward sign of a change in the status of the school, visible from this point of time, consists in the fact that after the union or incorporation the Legislature made appropriations from time to time from the public treasury for the medical department of the university, to construct and complete its buildings and purchase instruments and apparatus for its use, which would go to show that the school was considered to have ceased to be affected with a private interest, and to have become a purely public institution, part of the public educational system of the state; since public funds would hardly have been given to a private concern.
We find in the record a pamphlet bearing the title of “Register of Tulane University,” which is a catalogue or prospectus of the university for the year 1901-1902. This pamphlet purports to give official and complete information touching the organization of Tulane University. It speaks for the entire university, including the medical department; in other words, the-medical department vouches for its correctness as much as does any other department of the university. Now, we find in this pamphlet *679 no mention of or reference to the private corporation the Faculty of the Medical College of Louisiana. On the contrary, we find the statement made that by Act No. 43, p. 48, of 1884, the Legislature gave to the Board of Administrators of the Tulane Educational Fund “complete and perpetual control of the University of Louisiana.” We derive from this pamphlet the further information that the departments of the university are six in number, viz., the graduate department, the college of arts and sciences, the college of technology, the H. Sophie Newcomb Memorial College for Young Women, the law department, and the medical department; and that all the departments except the graduate are organized on precisely the same plan, namely, that each is in charge of a separate faculty, composed of the president of the university and of all the professors and associate professors and assistant professors who teach in the department; the graduate 'department being in charge of the university faculty, which consists of the president of the university, and the professors, associate professors, and assistant professors of the university.
The functions of the faculties we find to be as follows:
“Subject to the right of revision by the university faculty, it is the duty of each special faculty to determine the entrance requirements for its own students; to prescribe and define courses of study for them; to determine the requirements for such degrees as are offered to students under its jurisdiction; to enact and enforce rules for the government and guidance of its students; and to recommend to the administrators such candidates for degrees as may have completed the requirements.”
Plaintiffs assert that even to this day the medical department continues in the exclusive management of its pecuniary concerns, and in support of this they refer to the following, at page 124 of the same Register:
“The faculty reserve the right to decrease or to increase the above fees for the four-year course after the session of 1902-3; but it is not probable that the total fees for any one session will exceed $150.”
Suffice to say that, if the medical department does so continue to have control of its pecuniary affairs, it does so merely by the tolerance of the board of administrators, which unquestionably is invested by the act of 1884 and the Constitution with “complete control of the university in all of its departments and in every respect,” all laws to the contrary being repealed.
Plaintiffs rely on the case of Stone v. The 'Faculty of the Medical Department of the University of Louisiana, 28 La. Ann. 104, as a fact going to show the continued existence of the private company the Faculty of the Medical College of Louisiana. But that suit was against the faculty of the medical department of the University of Louisiana, a different body altogether from the Faculty of the Medical College of Louisiana; hence it affords no evidence of the continued existence of this private company. True, the court ‘in that case expressed the opinion that this private corporation had continued to maintain its separate organization, but that opinion of the court, whatever weight it may be entitled to as an opinion, is only an opinion. It is not a fact, or evidence.
As further evidence of the continued existence of this private corporation, plaintiffs refer to the certificate annexed to the act of mortgage on which this Stone suit is founded, and they call attention to the fact that the certificate is to the effect that the extracts of minutes to which it is attached are “true and correct copies of the records of the minutes of the meeting of the Faculty of the Medical College on the 7th day of April, *681 1852.” Did this certificate stand alone, it would have a great deal of weight as evidence going to show that in 1852 the Medical College of Louisiana was still in existence; hut the note and the mortgage executed in pursuance of the extract of minutes to which the certificate is attached were executed by the faculty of the medical department of the university, not by the Faculty of the Medical College of Louisiana. This shows conclusively that the use of the term “Medical College” in the certificate was a mere slip of the pen, and that the faculty whose minutes were thus certified was that of the medical department of the university. The parties could hardly have made a mistake in executing the note and the mortgage act. The private corporation the Faculty of the Medical College of Louisiana does not appear to have performed any function, or done any act, or given any sign of existence after the execution of the deed of transfer of its property to the university in pursuance of Act No. 147, p. 105, of 1847.
Discussion.
The statement made in the “Register” of the university that by Act No. 43, p. 48, of 1884, the Board of Administrators of the Tulane Educational Fund was given complete control of the university, seems to be fully justified by the provisions of said act. The language of the act is that this board “shall have all the rights, powers, privileges, franchises and immunities now vested in the Board of Administrators of the University of Louisiana by existing laws. That they shall further have full direction and control and administration of the University of Louisiana, in all of its departments. * * * The purpose of this act being to invest said board with all the rights now vested in the University of Louisiana: to give said board, moreover, complete control of said university in all its departments and in every respect, with all powers necessary or incidental to the exercise of said control,” etc. All laws “conflicting in any manner with the terms of this act” were repealed.
Whilst that act was a continuation of the old corporation the University of Louisiana, it was at the same time a reorganization of it, and the creation of a new and greater corporation, on still broader lines, and on a more comprehensive plan. That new corporation was given absolute and unqualified control of all the departments of the university, as much of the medical department as of any other. Most unquestionably, when that act had been thus passed, and came to be executed, if the private corporation known as the Faculty of the Medical College of Louisiana was still in existence, and was setting up any pretension to being the medical department of the university, and to be a distinct' and separate organization from the university, with distinct and separate powers, the obligation rested upon it then and there to declare itself and make its pretensions good, under penalty of being held to have renounced them. But we know, as a matter of public history, that.no such claim was set up, and no prbtest of any kind made; and the historical part of the pamphlet above referred to shows, as a matter of evidence, that the Tulane Board took complete charge of the university in all its departments, and that it has continued in charge ever since — a matter now of some 20 years. Under this act of 1884 the faculties are mere agencies of the university, and whatever powers they exercise is by delegation from the university.
Despite the above explicit and unequivocal language that “the purpose of the act” was “to invest said board with all the rights now vested in the University of Louisiana,” and “to give to said board, moreover, complete control of said university in all of its departments and in every respect,” and that said board should “possess all the powers, privileges, immunities, and franchises now *683 vested in said University of Louisiana, as well as such powers as may flow from this act, or may he vested in said hoard under the terms of this act”; despite, we say, this explicit and unequivocal language — the learned counsel for plaintiffs insist that the Tulane University nearly stepped into the shoes of the University of Louisiana, with no greater or enlarged powers, and with the same disabilities. This appears to us to be going squarely against the plainly expressed intention of the statute. But let us concede, for the sake of the argument, that the organization of Tulane University is identical with that of the University of Louisiana, what then?
The contention of plaintiffs we have already fully stated. It is that the effect and operation of article 138 of the Constitution of 1845, and of Act No. 49, p. 39, of 1847, creating the University of Louisiana, was to join to the university, as its medical department, the private corporation created by the act of 1835 under the name of the Faculty of the Medical College of Louisiana, with the same powers and disabilities, and, notably, the incapacity to receive donations mortis causa.
The contention of defendants is twofold: First, that this private corporation was not joined to the university, but that what was done was tliat the college which that corporation had established was utilized as a foundation on which to build the medical department of the university; secondly, that, if the intention was to consolidate this private corporation with the public corporation created by the act, then that from this consolidation there resulted the extinction of the old corporation, and the creation of a new corporation, whose powers and disabilities are to be determined solely by the act creating it; and that this new or consolidated corporation is expressly given the right to receive donations mortis causa.
Passing on to the consideration of these contentions, we find that throughout this legislation, in speaking of what is incorporated into the university, the term made use of is that of “Medical College of Louisiana”— that is, the school; and never that of the “Faculty of the Medical College of Louisiana” — that is, the corporation,’ founder, and regent of the school. From this persistent reference to the college and nonreference to the corporation defendants argue that the college alone was meant to be incorporated into the university, without its governing body the corporation; that'when the act used the term “college” it meant what it said.
The language of the Constitution of 1845 is that “the Medical College of Louisiana, as at present organized, shall constitute the faculty of the medical department” of the university; and that the Legislature shall provide for the “further organization and government” of the university. It was the school “as organized” that was to be taken into the university, and the Legislature was to provide only for the “further” government of the university. Now, the main part of an institution “as organized” is its government; and to provide for the “further” government of an institution is to retain the government already in existence, and use it as a foundation to build upon; not to abolish it altogether. In like manner the mere language of Act No. 49, p. 39, of 1847, descriptive of what is incorporated into the university, would lead to the conclusion that the school was adopted “as organized”; that is, including its government, the main part of its organization. Were we, therefore, to confine ourselves to the mere terms descriptive of what was to be adopted into the university, we should be disposed to agree with plaintiffs that it was the school, including the private corporation its governing body, that was thus adopted. The circumstance that throughout the act the private corporation'itself, the Faculty of the *685 Medical College of Louisiana, is not named even once, but invariably tbe term “Medical College of Louisiana” is used, as if merely the school, the handiwork of the corporation, was meant to be referred to, is robbed of all, or nearly all, significance by the use of the same term in section 19 of the act to designate the private corporation. It is there said that the real and personal estate of the Medical College of Louisiana is transferred to the university, evidently meaning the real and personal estate of the private corporation the Faculty of the Medical College of Louisiana. If the term is used to designate the corporation in one instance, why not in all?
But the Legislature, in enacting Act No. 49, p. 39, of 1847, does not seem to have placed that interpretation upon the Constitution of 1845; and counsel for defendants occupy' much stronger ground when they come to discuss the substance and necessary effect of the provisions of that act.
The act declares that the university is created with four faculties or departments, and that the Medical College of Louisiana shall compose the medical department. It then transfers the government and the property of this college to the university, including the privilege which the corporation, its founder, had theretofore enjoyed of conferring medical degrees.
The necessary effect of this was to destroy the corporation, for thereafter it had no property, and was incapable of acquiring any, and had no function to perform. It had been incorporated for the sole and exclusive purpose of organizing and conducting this medical college. When, therefore, it parted irrevocably with this college, it renounced its existence. To take away completely and permanently from a corporation the only function it can perform is to destroy it.
Under the rubric, “Forfeiture by Reason of Nonuser of Its Franchise,” 10 Oye. p. 1281, has the following: “While the abandonment and nonuser by a corporation of its franchises'will or will not work an ipso facto dissolution, according to the nature of the rights involved in the question and the manner in which it arises, yet it is well settled that, whenever a corporation voluntarily and totally abandons the exercise of its franchises, and does or suffers to be done acts which destroy the end and objects for which it was incorporated, this would authorize a judgment ousting it of its franchises at the suit of the state, or the appointment of a receiver by a court of equity to wind up its affairs under a statutory jurisdiction, on the ground that it has suffered de facto dissolution.”
And on page 724 of the same volume we find the following:
“Dissolution by Doing or Suffering Acts Which Destroy End and Object for Which Corporation Created. A dissolution de'facto within the meaning of statutes letting in the remedies of creditors against shareholders may take place whenever the corporation suffers acts to be done which destroy the end and object for which it was created.”
Counsel for plaintiffs argue that the Legislature was without power to affect the charter or dispose of the property of the Faculty of the Medical College of Louisiana, a private corporation, and that no action of the corporation itself can be pointed to showing that it accepted or consented to the destruction of its charter. • That is true; but if this corporation did not consent to and accept Act No. 49, it died at the expiration of the 30 years of its chartered term — that is, in 1865. So that the case propounded by plaintiffs assumes that the corporation consented to and accepted that act; hence that act must be viewed as a matter of consent and agreement, and our only concern be as to its proper interpretation.
By way of offset to the overwhelming force of the foregoing, counsel for plaintiffs point to Act No. 147, p. 105, of 1847, and to divers provisions of Act No. 49 itself, as *687 showing the continued existence of the private corporation.
Act No. 147 refers to the private corporation by its approximate legal name the Faculty of the Medical College of Louisiana, and provides that it shall transfer its property to the university. Here, say counsel, is an express recognition of the continued existence of this corporation after Act No. 49 had gone into effect; for, if the corporation was defunct, how could it make a tranfer? The argument is unanswerable, so far as it goes. But no one pretends that the corporation died of anything except of inanition or of old age. It unquestionably lived to do whatever there was for it to do, and possibly came completely to an end only by the expiration of its chartered term of 30 years. But after the transfer of its school and of its property, there was absolutely nothing for it to do.
Section 19 of Act No. 49 provides: “The professors now filling the chairs ' in said school, shall constitute the medical faculty of the department of medicine of the university and fill the same chairs in the university now filled by them in the Medical School of Louisiana; and hereafter be under the government of the board of administrators of the university; provided, that in the requisites for admission, examination of candidates for their degrees in said medical dex>artment, and the law department, the management of pecuniary concerns, the salaries of professors, and the price of tuition and terms of admission, shall be under the exclusive control of the faculty of said departments respectively.” Here the professors in their quality of professors, not in 'their quality of incorporators, are retained in their professorships, and are constituted the faculty of the medical department of the University of Louisiana, and the faculty thus organized is invested with a certain measure of autonom'y. This, say counsel, was an express recognition and continuation of the private corporation the Faculty of the Medical College of Louisiana, since the same faculty were to continue to have charge of the school. This argument confuses between the corporation and the individuals composing it. Under the act of 1835 these individuals had charge of the school not as a faculty, but as a corporation. Under Act No. 49 they had charge as a faculty, and not as a corporation, except that by Act No. 49 itself they were endowed as a faculty with certain powers for ■the management of the school. The professors of the law department were constituted a faculty in precisely the same way, and were invested with precisely the same measure of autonomy. In the case of the law department it is perfectly clear that no new corporation was created distinct and separate from the university, but that all that was done was that the faculty was endowed with certain powers for a special purpose. And so it was with the medical department. The fact that these professors of the medical faculty had stood towards the school in the relation of incorporators makes no difference. It is perfectly clear 'that they were no longer to hold that relation. Indeed, as if to prevent any misconception on that point, the Legislature, while adopting these professors, added: “And shall hereafter be under the government of the board of administrators of the university;” thus making it perfectly plain that the allegiance of these professors was shifted from the private corporation to the university.
“The management of the pecuniary concerns of the department was,” say counsel, “the most vital function, one capable of being exercised only by a corporation.” As already stated, the faculty were created a body, and endowed with some corporate, or rather quasi corporate, life. They were given certain things to do as a body, and necessarily were given the power needed to do them. But the faculty did not the less remain mere *689 ly one of the faculties of the university, just like the law faculty, or any one of the other faculties.
Plaintiffs attach great significance to the discrimination made between the medical department and the other departments of the university in the following clause of Act No. 49: “All of which said faculties, as the resources of the university increase, shall be completed by the administrators, except the medical department, which shall be composed of the Medical College of Louisiana,” etc. We do not see that anything more was intended by this than that the faculty of the medical college should constitute the faculty of the medical department of the university. Certainly the intention was not that the medical department should stand on a less favorable footing in its claims upon the resources of the university, for we find the Legislature in the very next year, by Act No. 104, appropriating $35,000, and directing the board of administrators to “cause to be completed the building of the medical department of said university.” And we find it, three years thereafter, by Act No. 239, p. 189, of 1850, appropriating $25,000 for the purchase of instruments, etc., for the medical department of the university.
Finally, plaintiffs rely upon the case of Stone v. Faculty, etc., already referred to, as deciding that by Act No. 49, p. 39, of 1847, the private corporation the Faculty of the Medical College of Louisiana was continued in existence. The court does, in 'a qualified manner, so hold. Its language is that “the corporate existence of the Medical College of the University of Louisiana has been continued, so far, at least, as to preserve the rights of their creditors, with whom the faculty have dealt, as shown in this case.”
The decision is short, occupying, without its headnotes, less than one page, only half of which is devoted to this question. In it there is no analysis of Act No. 49, p. 39, of 1847, but simply the court’s declaration that the act perpetuated the existence of the private corporation the Faculty of the Medical College of Louisiana. The only reason assigned is that “the provision of said act relative to the transfer of the property of the medical college to the university is conditional, and it is not pretended that the condition has been complied with.”
Thinking that possibly some evidence of such nontransfer of the property had been produced in the case, we examined the transcript in the case. We found that the only evidence on the question of property was that of the dean and of one other professor, who testified that the school, from the time their connection with it began, had had no property; all the property had belonged to the university.
While the court in that case was right in holding the faculty of the medical department of the university to the payment of this debt — which, upon examination, we find had been in part inherited from the former administrators of the school, and in part legitimately contracted by themselves in the course of their management of the school, and which they had been carrying for many years by renewals and partial payments— we cannot agree that the private corporation was continued in charge of the school, even as to creditors. The property of the private corporation may have continued to be liable to the creditors, and doubtless did so continue; but the professors, as individuals, were free to enter the service of the university, and could do so without bringing the private corporation along with them. As a matter of course, Act No. 49, in so far as it undertook to convert this school into the medical department of the university, was, as stated by the courts, conditional — in fact, it was in a sense the proposal of a bargain; but there can be, or in fact is, no question that the proposal was accepted and the bargain consummated. From the testimony above referred to, and as a matter, of public *691 history, and also from the legislative acts hereinabove given, we know that the building which this corporation had constructed on the ground leased to it by the state was duly transferred to the university.
The note sued on in that case had not been given by the private corporation the Faculty of the Medical College of Louisiana, but by the faculty of the medical department of the university of Louisiana, and the suit was brought against the maker of the note. Why, then, should the court have resurrected this private coiporation, we should be at a loss to know, had we not read the pleadings and the briefs of counsel in the case. The contention of the defendants was that the faculty of the medical department of the university of Louisiana, maker of the note, was not a coiporation, and that the •members of the faculty, as individuals, were not liable on the note; and that contention was met by the proposition, sustained by the court, that the medical department of the university was nothing more than a continuation of the old private corporation the Faculty of the Medical College of Louisiana, and therefore a corporation, and liable on the note, “at least so far as to preserve the rights of their creditors.”
It strikes us that the true theory would have been that under Act No. 49, p. 89, of 1847, the faculty of the medical department of the university was endowed with sufficient corporate life to perform the functions with which it was charged of managing its pecuniary concerns; and that for that purpose it was made a quasi Corporation, “ranking low down,” it is true, “in the scale or grade of corporate existence” (Dill. Mun. Corp. [3d Ed.] § 25), but nevertheless endowed with sufficient corporate life and power for doing its assigned work; and that this included the power “to acquire and hold any species of personal property the use of which was appropriate to its functions, and a reasonable means of carrying out the purposes of its existence” (10 Cye. 1139); and to the extent, at least, of the property so acquired and held, to create debts and issue notes therefor (Id. 1101, 1111); and that, inasmuch as the idea was that it should . take both the school and the property of the old corporation, the reasonable presumption would be that the idea also was that it should have the right to do what in point of fact it did do, namely, take or assume at the same time the debts, at least to the extent of the property taken (Id. lllld).
Our conclusion on this first branch of the contention of the defendants is that the private corporation the Faculty of the Medical College of Louisiana was not incorporated into the University of Louisiana by Act No. 49, p. 39, of 1847; but that the medical department of the university was endowed by tha-t act with a certain measure of autonomy, which it continued to enjoy until by the act of 1884 complete and absolute control of every department of the university was given to the Tulane Board.
Perhaps we might stop here, but in fulfillment of our self-imposed task to give the case as full and detailed treatment as if less free from doubt, we now proceed to the discussion of the second branch of the contention of defendants, namely, that if the act of 1847 had reference to this private corporation, and not merely to the school established by it, then that the act is to be construed as in the nature of a consolidation of an existing private corporation with a public corporation not theretofore existing, but created by the consolidating act itself, with the result that after the consummation of the consolidation the old company went out of existence, and a new corporation came into being, whose rights, powers, and duties are determined solely and exclusively by the consolidating act.
Under the rubric, “Effect of Consolidation —1. Upon Existing Rights and Obligations — . Whether Consolidation Creates New Corpo *693 ration,” 10 Cyc. 302, has the following: “This question must he answered upon consideration of the terms of the statute under which the consolidation takes place. * * * The general rule that the consolidation of two or more corporations into one created a new company in such a sense as to work a dissolution of the original corporations forming the consolidated company is said to be subject to exceptions, and to depend upon the statute under which the consolidation is effected.”
Again: “It seems that whether the consolidation of two corporations works a dissolution of the constituent companies depends upon the terms of the statute under which the consolidation takes place.”
The terms of Act No. 49 in respect to their effect of divesting the private corporation created by the act of 1835 of all its powers and functions and transferring the same to the board of administrators of the university have already been discussed. The private corporation was divested of its actual property, and also of its power to have and to hold property in future, since it had had this power only in connection with the school that was taken away from it; and along with the power to have and to hold property went away from it its board of trustees, inasmuch as the sole function of this board was to have charge of the property of the school. It was divested likewise of its power to appoint and remove professors, of its power to regulate the course of studies and the discipline of the school, and of its power to confer degrees. If, then, it continued to exist thereafter, the pertinent inquiry is: What did it live for? What were its functions? The consolidating act transferred all these functions to the new corporation, and it contained no provision for the continuation of the denuded corporation. The members of the faculty thereafter owed their appointment and derived their authority solely from the act of 1847, and from the board of administrators created by that act; and the faculty, as an agency for having charge of the pecuniary concerns of the school, was the creature of the same act. The fact that it happened to be composed of the same individuals who had composed the defunct corporation can make no difference in the legal situation. On the very face of things it is evident that the idea was to conserve the private interest of these individuals, while, possibly, doing away with the corporation no longer useful.
We conclude that plaintiff’s first ground is not sustained.
And, indeed, can any good reason be given why the Legislature, in creating the university, should have denied to it the right to receive donations by bequest for the benefit of its medical department. The prohibition to the private corporation to receive testamentary gifts was strictly in line with article 1489, Civ. Code, by which physicians who have professionally attended a person during his last illness cannot receive from such person donations made during that illness; but we imagine the law would look rather with favor upon gifts such as the one in question in this case, whether considered as made in furtherance of education or in furtherance of charity.
2. The second ground of nullity divides itself into two branches: (a) That the will contains a prohibited fidei commissum; (b) that it seeks to create a tenure of property unknown to the law of Louisiana.
(a) The conclusion hereinabove arrived at that the medical department of Tulane University is not a separate corporation, but merely one of the faculties of the uniyersity, disposes of the contention that the bequest to Tulane University for the benefit of its medical department imports a fidei commissum. There cannot be a fidei commissum without a third person for whose benefit the *695 trust is created; and, if tlie medical department is simply .one of the faculties of the university, it is not a third person.
We may add, however, that, even if it were conceded that the private corporation created hy the act of 1835 was perpetuated by Act No. 49, p. 39, of 1847, and, further, that this bequest creates a trust for its benefit, there would still be grave doubt as to this ground of nullity. From the analysis hereinabove made of the substance and effect of Act No. 49, it has been seen that the charter of this private corporation if perpetuated at all, was perpetuated only in profoundly modified form; and the question would be as to whether the modification had not extended to the removing of this incapacity to receive donations mortis causa. That analysis shows that, if continued at all, the private corporation was metamorphosed into a public agency, a quasi i>ublic corporation, part and parcel of the university, of the public educational system of the state, endowed with perpetuity, and its property dedicated for all time to the service of public education, on an exact parity with the other property of the university. This profound change in the character of the institution, and especially this taking out of private ownership any property it might acquire and dedicating it in perpetuity to the public service, had the effect of doing away completely with the sole reason why theretofore the institution had been denied the privilege of receiving testamentary gifts, which reason has been already adverted to; and the question would be whether the Legislature, while it was thus doing away with the sole reason for this disability, entertained the desire that the disability itself should continue. “Oessante ratione cessare debet lex ipsa.” As the learned counsel for the executors put it: “The public policy which might prohibit testamentary gifts to a private corporation of doctors would certainly not prohibit such gifts to a great state institution empowered to teach medicine.” Would the Legislature, while creating a university, handicap it right at the start with an incapacity of this kind? Stated more concretely, the question is whether, by making this private corporation the medical department of the university part and parcel of the university, and authorizing the university to receive donations mortis causa, with no reserve as to the medical department, Act No. 49 would not have, in point of fact, authorized the receiving of bequests for this medical department as much as for any one of the other departments. It would look very much that way; but it is not necessary to go into the question, nor into the other question whether this bequest, even if importing a fidei commissum, would not be valid under Act No. 124, p. 172, of 1882, by which the creation of trusts for the benefit of educational and charitable institutions is expressly authorized.
(b) The tenure under the will is said to be illegal for the reason that the fund is required to be disbursed “under the direction and supervision of the medical faculty” and “for the objects designated.” The administrators of the Tulane Fund, it is said, “are thus nothing more than the custodians of the fund, the mere disbursing agents, without power of control or direction.” Again: “The university is not made the owner of the legacy; but the will attempts to create a tenure of property, which is not known to and not recognized by the law of the state.”
We eliminate at once the circumstance that the testator has designated the object to which he has desired that the fund should be applied. Such a designation accompanies every donation for pious uses.
The circumstance that the fund is required to be disbursed “under the direction and supervision of the medical faculty” could have been significant only if plaintiffs had succeeded in showing that the med *697 ical faculty was a separate legal entity from the university. But as matters stand this faculty and the university are one, and, as a consequence, the gift is to the university purely and simply. As well observed by the learned counsel for Tulane University: “The faculty of the medical department being the mere creature of the university, or of its board of administrators, to say that the money shall be expended by the board of administrators under the direction of the faculty is equivalent to saying that the board shall expend it as they may see fit.” Indeed, the disposition is precisely on a par with a bequest of a sum of money to the city of New Orleans for the benefit and improvement of the city park, to be expended under the direction of the board of commissioners of the city park for that purpose. No one, we imagine, would dispute the legality of such a bequest. In the ease of Succession of Yance, 39 La. Ann. 373, 2 South. 54, a bequest to “the Insane Asylum of the City of New Orleans” was held to be a bequest to the city itself, inasmuch as the asylum in question was nothing more than an agency of the city, without a corporate existence of its own. The bequest was upheld, although, before it could be accepted, the asylum had been discontinued by the city.
If, however, the medical department were conceded to be the continuation of the corporation created by the act of 1S35, the situation would be that it and the other parts of the university composed a complex corporation, and the court would have to consider whether the rules made for the government of the relations between ordinary persons would apply to the relations between the members of such a corporation; in other words, whether a tenure by the university for the use of one of its members could be likened to a tenure by one ordinary person for another.
That field of inquiry is inviting, but we could only lose time by venturing into it; since by the concession of the continued existence of the old corporation the question of its incapacity to receive donations mortis causa is revived, and, whatever conclusion we reached on the point of how far there may be diversity of person under our law of wills where there is no diversity of interest, that question would still confront us, and once already in this opinion we have put it aside as not necessary to be decided.
3. Plaintiffs’ third and last ground is that the objects and purposes of the bequest are ultra vires of the university and of its board of administrators, in that the university has no authority to establish and maintain a clinic and a hospital.
This contention is without foundation, for two reasons: (a) Because the provision regarding the use of any part of the fund for a clinic and a hospital forms no part of the dispositive portion of the testament, and whether considered as merely advisory or as • imposing a condition upon the bequest cannot affect its validity. If merely advisory, it may be disregarded; if imposing a condition, the condition will be carried out if legal, and, if illegal, will be treated as an impossible condition, and as such null and void, under article 1519 of the Civil Code, (b) Because the establishment and maintenance of a hospital is not ultra vires of the university and of its board of administrators.
(a) Four paragraphs of the will are devoted to the bequest. The first, which, in our opinion, is alone dispositive, reads as follows:
“I give the balance of my estate, real and personal, to the Tulane University of Louisiana, for the sole and exclusive benefit of its Medical Department; the objects of this bequest are to create a fund to be used in increasing the efficiency of the Medical Department of the Tulane University of Louisiana as a Medical School, and to contribute to its usefulness and beneficence in minister *699 ing to the ailments, injuries, and other physical infirmities of the suffering and destitute poor of all races, ages, sexes, and nationalities.”
Here is an unconditional gift, coupled only with an announcement of the object of the gift. This certainly vests the title in the university. The subsequent paragraphs do not purport to withdraw the title thus vested, or to modify it; but at most superadd conditions to it, or merely contain advisory directions regarding the use of the property.
Defendants contend that what is said in these subsequent paragraphs was added by the testator merely by way of advice; and there is much to recommend that view. The last two paragraphs are clearly advisory only. The words are, “It is contemplated,” “I recommend” — terms of mere advice, clearly. The other paragraph begins with the phrase, “In furtherance of the purpose of the bequest.” These words would seem to carry the implication that the bequest was considered by the testator to have already vested completely and finally, for the purpose clearly and definitely and once for all expressed in the first paragraph, namely, “to increase the efficiency of the medical department of Tulane University Medical School.” The testator first makes the absolute and unconditional gift for the purpose designated, and then adds that “in furtherance” of that purpose “the fund is to be used,” etc. His prime object, evidently, was to increase the efficiency of the medical department of Tulane University as a medical school. That object he expresses at the time of making the bequest, coupling it with the bequest as the moving cause of his action. He then proceeds to give his ideas as to the best means of accomplishing that object. But he does not impose those ideas as conditions inherent in and controlling the gift. He does not say, for instance, that this clinic and this hospital are the sole aim and object of his’gift, and that the fund must and shall be expended only in that way. His language is, “In furtherance of the purpose of the bequest.”
Granting, however, that these directions amount to a condition, and that this condition is one impossible of accomplishment because of the incapacity of the university to fulfill it, the bequest would not be on that account the less valid. The case would then fall squarely within the principle of article 1519, Civ. Code, and under the doctrine of the cases of Succession of Franklin, 7 La. Ann. 395; State v. Executors of McDonogh, 8 La. Ann. 171; Orphan Asylum v. New Orleans, 12 La. Ann. 62; and Partee v. Hill, Id. 767.
In the Succession of Franklin, the court said:
“When the words of the testamentary disposition are sufficient to vest a legal title in the legatee, and the intention of the testator to create such a title for his benefit, to the exclusion of the heirs at law and of all persons, is ascertained, then, in furtherance of that intention, any impossible or illegal condition the disposition may contain is presumed to have been inserted inadvertentlj', and is reputed in law not written.”
In the case of the State v. Executors of McDonogh the Gourt said:
“It is urged that the testator never intended the cities to take the property unless his directions were to be observed; and, if the cities could not and did not carry into effect his directions, in that event, his will was that his property should go to the state.
“I believe I am only following in the uniform current of opinion in the civil-law writers and in the decisions of the court of cassation in treating the directions contained in this will concerning the property and its administration as modes, charges, or conditions. There is one mode or condition — and it is that on which the district judge has decided the ease — the utter impossibility of the compliance with which cannot be con *701 tested. It is that prohibiting the partition of the lands bequeathed to the cities of New Orleans and Baltimore, and requiring that their joint ownership to continue forever. The same-may be said of the supervision and check which the testator attempts to organize of one corporation over the other through the instrumentality of commissions. In these respects it is clearly impossible under our laws to carry into effect the intention of the testator. The condition is impossible, and there are others equally so in the will which it is not necessary particularly to note.
“Our inquiry is to be directed to the effect which the law gives to impossible conditions in testamentary 'dispositions. At the commencement on the inquiry we are met by the dilemma on the part of the defense. If the conditions, modes, or charges imposed on the legatees by the will are legal and possible, we will execute them; if they are not legal or possible, as the plaintiffs insist they are, then and in that case they form no part of the will. By article 1506 of the Code every impossible condition contrary to the laws and to good morals is reputed not written in a will, and the property remains to the legatees free from the incumbrance of the impossible condition, mode, or charge.”
In the case of Orphan Asylum v. New Orleans, 12 La. Ann. 62, the validity of a bequest made by McDonogh to the Society for the Belief of Destitute Orphan Boys was in question. The testator had given, as an annuity, to the Society for the Belief of Destitute Orphan Boys, one-eighth part of net yearly revenues of the rents of the whole of his estate until $400,000 was realized; the said one-eighth part of the revenue to be set apart yearly or half-yearly by the commissioners and agents of the general estate, for whose appointment the will provided, and deposited in some one or more of the banks of New Orleans until the same should amount to $400,000. The will provided that the said amount should be invested in the purchase of real estate from which a perpetual revenue from the rents of said estate should be drawn for the support of the institution; that the directors of the said society, assisted by the mayor and aldermen of the city of New Orleans, should make the investment, and that the mayor and aldermen should approve the purchases of real estate, and become parties to the deeds by which the property should be acquired. It was held by the court that the mode of investment was a matter of mere form, which could not operate to annul or defeat the bequest; that it "was not in the power of the testator to compel the city, through its mayor and aldermen, to become a party in the purchase of real estate in which it was to have no interest, it being the intention of the testator that the Society for the Belief of Destitute Orphan Boys should be the recipient of the bounty; that the liability of the defendants to discharge the legacy was not affected by the control over the estate given in the will to the commissioners and agents •whose appointment was directed; that it was contrary to public law and policy that the simple tenure by which alone our laws permit property to be held should be so complicated; and that such illegal modes, conditions, and charges imposed by the will are to be disregarded.
In the case of Partee v. The Succession of Hill, 12 La. Ann. 767, the precise question involved in this case was presented.
The bequest read:
“I give and bequeath" to my niece, Mary B. Todd, wife of Sterling H. Lester, and to her heirs, forty thousand dollars, and appoint as trustees, to invest the same and pay to her, after receipt thereof, the interest annually, my friends, James Lea McLane and William B. Partee, or either of them, in case of resignation or death of the other.”
The court held that the legatee was entitled to the bequest absolutely, and that the *703 provision of the will providing for the management of the fund by the trustees should be considered as not written.
The court said:
“It is clear that the bequest was to Mary R. Todd, wife of Sterling H. Lester, and her alone. No interest in this legacy was to vest in any one else. If the clause referring to the trustees be considered mandatory — in other words, as a condition of or mode of clogging the title of Mrs. Lester-then it is void, and must be considered as not written. New titles cannot be invented by testators. Absolute ownership bequeathed to a specific person cannot be crippled by the appointment of supervisors of a class unknown to our laws, who shall, for the period of their natural lives, keep the owner out of possession against his will, and manage for him what he is capable of managing for himself. * * *
“If the clause concerning the trustees be regarded as advisory merely, it need not be expunged from the will. If the legatee had chosen to avail herself of the testator’s recommendation, Partee might have sued; for her acquiescence would have made him her agent, and he would have derived his powers from her, not from the mere force of the testator’s will. We have expressed our views upon this subject in the case of the Society for Orphan Boys v. New Orleans, 12 La. Ann. 63. But, as she repudiates his authority, he is acting against his principal, and cannot be heard. The will gave him no such interest in this legacy as would entitle him to demand it against the remonstrance of the party to whom it was bequeathed. She is capable of standing in court, and the judgment in her favor must be affirmed.”
The doctrine of these cases is recognized and reaffirmed in the Succession of Kernan, 52 La. Ann. 48, 26 South. 742. This court, interpreting the Kernan Case, in Succession of Meunier, 52 La. Ann. 90, 26 South. 776, 48 L. R. A. 77, holds that Kernan’s will conveyed no ownership in the property bequeathed to anybody — neither to the church nor to the archbishop.
(b) The contention that the establishment and maintenance of a hospital is ultra vires of the university and of its board of administrators is clearly untenable. Of course, the maintenance of beds for the destitute poor is not a university function, but that feature is put by the testator in parenthesis, and is expressly left to the discretion of the administrators. Therefore we are concerned only with what relates to the establishment and maintenance of a hospital for the sick.
On the subject of the connection between a medical school and a sick hospital, Dr. Rudolph- Matas, the distinguished professor of surgery in the medical department of Tulane University, testifies as follows:
“From the very beginning of the systematic teaching of medicine all over the world it has been found necessary — absolutely necessary — that the acquaintance of students should be made with disease at the bedside. From the days of Hippocrates it has become evident that medicine should only be studied by the student at the bedside of the patient himself. Realizing these conditions, the founders of this university, as well as other medical schools, have always endeavored to utilize clinical material for the instruction of their students. This is simply the application of a principle in the teaching of medicine which has come to us from remote antiquity down to the present time, and has been extended, developed, and perfected in accordance with the means and resources of every institution. No medical college can really exist as such without patients as a basis of instruction, without clinical material, as we call it; ‘clinical’ meaning the study of disease at the bedside. Clinical instruction is a part of the teaching in every, medical school. The necessity for such a mode of instruction is so plain as to be al *705 most axiomatic, and needs no demonstration. The more clinical material, the better the school. Just as an illustration of the importance attached by medical men to the hospital as a necessary adjunct to the medical school, I will quote the first line of a recent article on medical education by Professor Osier, of the John Hopkins University, which appeared in the Medical News of January 10th, in which he adopts the following quotation from Abernethy as his motto: ‘The Hospital is the only proper college in which to rear a true disciple of iEsculapius.’ The basis of the success of every medical college is the association of a hospital with a medical college. One is indispensable to the other.”
If, then, a hospital is indispensable to a medical school, can any one in reason say that the authority to establish and maintain a medical school does not include authority to establish and maintain a hospital. A hospital used for such purposes is an educational institution. In re Mass. General Hospital (C. O.) 95 Fed. 973; same case on appeal, 100 Fed. 932, 41 C. G. A. 114. Realizing the force of the foregoing, the learned counsel for plaintiffs are driven to argue that the medical department of Tulane is already sufficiently provided with clinical opportunities by having access to the Oharity Hospital, and that, therefore, a hospital is unnecessary, and the establishment and maintenance of one is ultra vires. But that argument can hardly be serious. As well might it be argued that the university has no need of a library of its own because it has access to the Fisk and Howard Libraries. As very well observed in the brief of the distinguished counsel for the executors: “Any institution organized by law to teach medicine has, as necessary incident thereto, the right to set up and maintain a hospital in order to afford its students opportunity for the study of disease and injury, to be instructed at the bedside of the patient. A medical school has as much power and authority to have a library of living disease as a literary school has the right to have a library of books. It requires no special legislative authority to build a house, set up beds in it, and invite sick people to come there and be treated. It requires no special legislative authority to buy books and place them on shelves to be read.” Ex parte Whitwell (Cal.) 32 Pac. 870, 19 L. R. A. 727, 35 Am. St. Rep. 152.
If further authority were needed, it could amply be derived from the twelfth section of the act of 1847, and the eleventh section of the act of 1855, authorizing the board of administrators to “attach to the university such other institutions, literary or scientific societies, schools and professorships, as to them may seem advisable.”
Doubtless, as said by plaintiffs’ learned counsel, the character of the institution thus authorized to be attached must be determined by the context. “Noscitur a sociis.” It must be such a concern as will bear some appropriate relation to the objects and purposes of the university. But a hospital for the sick is shown to be not only closely allied to a medical school, but absolutely indispensable to it.
Judgment affirmed.
MONROE, J., recused. NIOHOLLS, J., not having heard the argument, takes no part.