INGRAM v. TEXAS CHRISTIAN UNIVERSITY.　(No. 8578.)*

(Court of Civil Appeals of Texas. Ft. Worth. April 10, 1917. On Motion for Rehearing, May 21, 1917.)

1. CORPORATIONS ⬤484(3) — ULTRA VIRES CONTRACTS—GUARANTY OR SURETYSHIP.

It is ultra vires of a corporation, not given express authority, to enter into contracts of guaranty or suretyship not in furtherance of its business.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1815.]

2. COLLEGES AND UNIVERSITIES ⬤5—CORPORATE POWERS AND LIABILITIES—CONTRACTS—SURETYSHIP—"UNIVERSITY."

A university whose charter provides for the establishment of an institution of university rank for the purpose of education in all branches of learning, and that there is included in its purpose the acquisition, establishment, and maintenance of auxiliary and correlated schools, etc., has power to make a contract for the rent of a building in which a school of medicine, an auxiliary school correlated with the University, might establish a hospital, as the term "university" implies an institution of many departments, and the building up of one department would necessarily promote the interests of the University as a whole.

[Ed. Note.—For other cases, see Colleges and Universities, Cent. Dig. §§ 5, 6.

For other definitions, see Words and Phrases, First and Second Series, University.]

3. COLLEGES AND UNIVERSITIES ⬤6(5)—POWERS OF EXECUTIVE COMMITTEE—CONTRACTS.

Where the executive committee of the University, composed of some of the members of the board of trustees, authorized the business manager of the University and the auxiliary school to execute the lease, and he and the secretary of the board of directors signed it, the lease was valid, where not questioned by the board of directors as a whole.

[Ed. Note.—For other cases, see Colleges and Universities, Cent. Dig. § 15.]

On Motion for Rehearing.

4. LANDLORD AND TENANT ⬤232—FAILURE TO PAY RENT—ATTORNEY'S FEE.

The landlord was entitled to have the attorney's fees specified in the lease included in his judgment for rent, where the reasonableness thereof was not questioned.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 935–939.]

Appeal from District Court, Tarrant County; R. B. Young, Judge.

Suit by J. C. Ingram against the Texas Christian University. Judgment for defendant, and plaintiff appeals. Reversed and rendered.

Samuels & Brown, of Ft. Worth, for appellant. McCart, Curtis & McCart, of Ft. Worth, for appellee.

BUCK, J. Suit was instituted by appellant to recover from appellee for rents on a building situated in the city of Ft. Worth, Tex. The rents claimed were from August 29, 1914, to date of suit, to wit, March 1, 1916, at $150 per month. The defendant denied liability because, as alleged, the defendant did not. through its directors and proper officers, authorize the rental contract upon which plaintiff based his suit, said pleading being in the nature of a plea of non est factum, and pleaded, further, if it did so attempt to execute the contract, such act was ultra vires. The cause was tried before the court without the intervention of a jury, and judgment rendered for defendant, and plaintiff has appealed.

The court has filed his findings of fact and conclusions of law, which findings we will hereinafter set out, and, for the sake of brevity, will in certain instances only give the substance of the findings. Neither party assails the findings of fact, appellant's ten specifications of error being directed to alleged errors of law.

The court found:

(1) That on May 26, 1896, a corporation was organized under the name of "the Medical Department of the Ft. Worth University," with its principal office and place of business at Ft. Worth, Tarrant county, and the recited purpose of the corporation was "the establishment and support of a school of instruction in general medicine, surgery, pharmacy, dentistry, and allied branches of learning."

(2) "I find that the Medical Department of the Ft. Worth University, in connection with and as a part of said school, conducted a hospital, in which it treated, among others, charity patients, and gave clinical instructions to its students. That some suits were brought by some of the charity patients, and to avoid further suits, some of the stockholders of the Medical School, on October 25, 1907, organized a new corporation with the following name and for the following purposes, as shown by its charter, to wit: '(1) The name of the corporation is the College Hospital Association. (2) The purpose for which it is formed is for the erection and maintenance of a sanitarium.'"

(3) "I find that the corporation, the College Hospital Association, conducted its hospital in the same building with the Medical School, and that the Medical School students were given clinical instructions in this hospital."

(4) "I find that on or about the 8th day of June, 1910, the Texas Christian University amended its charter and located at the city of Ft. Worth, which corporation was organized for the following purposes and with the following powers, as shown by articles 1, 2, and 3 of its charter:

"'Article 1. The name of this corporation shall be Texas Christian University.

"'Article 2. The purpose for which this corporation is formed is the support of an educational undertaking to wit, the establishment and maintenance of an institution of learning of University rank, for the education and training of students in the arts, sciences, and languages, and in all branches of learning, under Christian influences, so that such education shall include due regard to moral and religious development and competent instruction in the Holy Scriptures. There is also included in its purposes the acquisition, establishment, and maintenance of auxiliary and correlated schools and school property at such points in the state of Texas as may be found advisable, to be under the same

general management and conducted with the same aims.

"'Article 3. The place or places where the business of this corporation is to be transacted shall be at the city of Ft. Worth, in Tarrant county, Tex., where its University is now located, but not necessarily within the corporate limits of said city. But such business affairs of its auxiliary and correlated schools as may by the corporation be committed to local boards, governing bodies, or faculties may be transacted at the places where such auxiliary schools may be established.'"

(5) That on August 12, 1911, the Medical Department of the Ft. Worth University changed its name to the "Ft. Worth School of Medicine—Medical Department of the Texas Christian University."

(6) That the Ft. Worth School of Medicine—Medical Department of the Texas Christian University, by the amendment of its charter and its connection with the Texas Christian University, became a correlated and auxiliary school with the Texas Christian University, and has since occupied that attitude towards the University. But the said Medical School has a separate board of directors. That no part of the income of the Medical School was received by the University, and the University did not defray any of the expenses of said Medical Department.

(7) That prior to October 26, 1913, and subsequent thereto, the University advertised in its catalogues and other advertisements, seeking to induce students to attend the University, that one of its departments was a medical school. That the Medical School meant by this advertisement was the Ft. Worth School of Medicine—Medical Department of the Texas Christian University, and that subsequent to the change of name of the Medical School the president of the University signed the diplomas of the graduates of the Medical School.

(8) That in October, 1913, and until the following summer, J. A. Dacus was the business manager of the University and of the Medical Department thereof, but his salary was paid entirely by the University. That all of the students of the Medical School were accorded the privilege by all of the hospitals of the city to visit the charity patients for the purpose of observing their treatment, etc.

(9) Just prior to October 22, 1913, Drs. Chase and Saunders, who were directors and members of the faculty of the Medical School, Dr. Saunders also being one of the directors of the Hospital Association, approached appellant with the view of renting from him the second floor of a two-story building on East Weatherford street between Commerce and Calhoun streets in Ft. Worth, Tex., in order that the Hospital Association then operating under the name of the "College Hospital Association" could conduct a hospital in this building, and that the students of the Medical School could obtain the clinical instructions therein, said Drs. Chase and Saunders representing to the appellant that the renting of the building was for the benefit of the Ft. Worth School of Medicine—Medical Department of the Texas Christian University. Appellant declined to rent to the Medical School or to the Hospital Association, stating that he did not know the financial standing of the "Doctor's Association," but that he would rent to the Texas Christian University, and that said University could rent or sublease to the Hospital Association.

(10) That Dr. Bacon Saunders and others appeared before the trustees of the University, and requested said body to authorize and instruct J. A. Dacus, its business manager, to lease the building from Mr. Ingram and obtain permission for the University to sublease the building to the Hospital Association, in order that the students in the Medical School might

obtain the clinical instructions, and said board declined to do so; but the executive committee, being a committee composed of six of the trustees, afterwards did so.

(11) That on October 23, 1913, the "College Hospital Association," by amendment of its charter, changed its name to that of "the University Hospital Association."

(12) On October 25, 1913, Mr. Dacus, the business manager of the University, and E. M. Waites, secretary, in pursuance of instructions given by the executive committee of said University, executed the lease contract forming the basis of this suit, and appellant, through his agent, indorsed on said contract permission for the University to sublease the premises. The recited proposed use of said premises was for hospital purposes. It was provided that the lessees, at their own expense, were granted the privilege to make certain alterations as to partitions, rooms, and plumbing, but were required to replace said premises in their original condition if demanded by lessor, at the expiration of the rental period. The contract provided for a lease of three years from October 29, 1913, "the said lessees yielding and paying therefor the sum of $5,400 in equal monthly installments, to wit, the sum of $150 on the 29th day of October, 1913, and the same amount on the 29th day of each and every month thereafter until the whole sum of $5,400 shall have been fully paid." In other respects the contract was in the usual form and contained the customary provisions. It was signed: "J. C. Ingram, by I. Carb. Attest: E. M. Waites, Sec'y, Texas Christian University. Texas Christian University, by J. A. Dacus, Business Mgr. [T. C. U. Seal.]"

(13) That the University Hospital Association immediately took charge of the building and occupied it about ten months. That during its occupancy the students of the Medical School were given in that building, in connection with the patients therein, the clinical instructions necessary to be given in a hospital. That said Hospital Association had no lease with appellant, the above being the only lease contract between any of the parties aforesaid.

(14) That the Hospital Association paid to appellant's agent the rent on said building up to August 29, 1914, at which time it vacated the building and all the furniture and fixtures were turned over to the University in payment of a debt said Hospital Association owed to said University, and that said Texas Christian University never at any time paid any part of the rents of said building.

(15) That the Texas Christian University had no control over the University Hospital Association, and did not receive any part of the revenues of said University Hospital Association. That a hospital is indispensable to the successful operation of a medical school, and that medical students must necessarily receive a part of their instruction in a hospital.

(16) That no part of the rent due and accruing since August 29, 1914, has been paid, and that this suit was instituted in an effort to collect said rent.

The court's conclusion of law was:

"That the execution of said lease by Texas Christian University was an effort on its part to lend its credit to and guarantee the debts of the University Hospital Association, which was ultra vires said Texas Christian University, and created no legal obligation on its part to comply with the terms of said lease, and to pay the rent as therein provided; hence I render judgment in favor of defendant."

It is contended by appellee, and was so urged in the court below, that this contract is in fact one of suretyship; that appellant knew the purposes for which his building was desired, to wit, for the use of the University Hospital Association; that in demanding of Drs. Saunders and Chase that the rental contract should be made with the Texas Christian University, he was in effect demanding that the University should become surety for and lend its credit to the Hospital Association. This view of the facts is the one most favorable to appellee's contention and to the judgment below. Therefore we will briefly discuss the question of whether or not the act of the University was ultra vires, upon the theory of suretyship.

[1] It is well established by the authorities that it is ultra vires of a corporation to enter into contracts of guaranty or suretyship not in furtherance of its business, unless given express authority to do so. As said in 7 R. C. L. pp. 603, 604:

"The fact that the corporation may reap some indirect benefit from becoming a surety or guarantor for another does not confer upon it implied power to do so; and two corporations, though each may incidentally be benefited, have no implied power to borrow a sum of money to be divided between them, and each become the surety for the other for the amount of money received by such other. * * * It is not, however, ultra vires for a corporation to enter into contracts of guaranty or suretyship where it does so in the legitimate furtherance of its purposes and business. * * * A corporation may guarantee the payment of a debt which it may directly contract to pay; thus a railroad corporation as lessee of another railway has been held to have implied power, as part of the rental, to guarantee the payment of the bonds of the lessor company."

Article 1164, Vernon's Sayles' Texas Civil Statutes, is but declarative of the general rule as laid down by the above-quoted text. It provides:

"No corporation, domestic or foreign, doing business in this state, shall employ or use its stock, means, assets, or other property, directly or indirectly, for any other purpose whatever than to accomplish the legitimate objects of its creation or those permitted by law."

The amendment to this article by the Thirty-Fourth Legislature (Acts 34th Leg. c. 102) does not change it in so far as its application to the facts presented in this record, and, further, the amendment was made subsequent to the date of the contract sued on.

[2] As will be noted, the purpose for which the appellee corporation was created, as shown by article 11 of its charter, was:

"The support of an educational undertaking, to wit, the establishment and maintenance of an institution of learning of University rank, for the education and training of students in the arts, sciences and languages, and in all branches of learning."

Further:

"There is also included in its purposes the acquisition, establishment and maintenance of auxiliary and correlated schools and school property at such points in the state of Texas as may be found advisable, to be under the same general management and conducted with the same aims. * * * But such business affairs of its auxiliary and correlated schools as may by the corporation be committed to local boards, governing bodies or faculties may be transacted at the places where such auxiliary schools may be established."

The trial court found: That the Ft. Worth School of Medicine—Medical Department of the Texas Christian University by the amendment of its charter and its connection with the Texas Christian University, became a correlated and auxiliary school of the Texas Christian University, and occupied such attitude at the date of this contract. That the University, prior and subsequent to the date of this contract, advertised in its catalogues and other advertisements, seeking to induce students to attend the University, that one of its departments was a Medical School, and that it meant by said Medical School the Ft. Worth School of Medicine—Medical Department of the Texas Christian University, and that the president of the University, subsequent to the change of name of the Medical School, signed the diplomas of the graduates of this school. That on or about the date of the lease contract mentioned, J. A. Dacus was the business manager of both the University and the Medical School; his salary being paid entirely by the University. The findings of the court in respect mentioned in this paragraph are not assailed by the appellee under any cross-assignments, nor in fact has appellee preserved and presented any cross-assignments, unless its so-called "first independent proposition," which will be hereinafter noted, might be so termed. Hence we are authorized to find that the Medical School was a correlated and auxiliary school or department of the University, and was such a department as was contemplated in its announced purposes of incorporation. That the University Hospital Association was organized for the purpose of furnishing to the Medical Department of the University, clinical and hospital advantages to the students, and that in the latter's conduct and support the Medical School and the University as a whole was directly benefited, and that the establishment, maintenance, and support of such Hospital Association was within the general purview of the recited charter purposes of the University, and was within the legitimate objects of its creation. In the case of Munoz et al. v. Brassel et al., 108 S. W. 417 (writ denied), the Court of Civil Appeals for the Fourth District held that a corporation whose charter provided that its principal business was the buying and selling of liquors, etc., at wholesale and retail, had implied power to sign a saloon keeper's bond as surety, though no express or implied contract existed between them that he would purchase liquors of the corporation, since becoming a surety for a possible customer is a proper and usual means of promoting its business. In the case of Live Stock Co. v. West Texas B. & T. Co., 111 S. W. 417 (writ denied), it is said:

"Ordinarily, a contract of suretyship is foreign to the object for which corporations are created; but there are exceptions to this rule, one of which is that, though not expressly authorized, the corporation may become a surety when it is necessary to enable it to accomplish the object for which it was created, or whenever the particular transaction is reasonably necessary or proper in the conduct of its business."

In the case of Horst v. Lewis et al., 71 Neb. 365, 98 N. W. 1046, 103 N. W. 460, the Supreme Court of Nebraska held that a brewing corporation may become liable as surety upon a liquor license bond executed by it to induce the licensee to lease a building from it and deal exclusively in its products. In Winterfield v. Brewing Co., 96 Wis. 239, 71 N. W. 101, the Supreme Court of Wisconsin held that it was not ultra vires for a corporation organized to make and sell beer to guarantee the rent of a customer, saying:

"The purpose of the defendant's organization was to manufacture and sell beer. Doubtless it was competent to make any contract, which was convenient and adapted to further that purpose, which was not against public policy. No doubt, it was within its competency to rent a place for the sale of its beer by its agents or servants. To rent a place where one of its customers would retail its beer would seem, in a similar manner, to further the purpose of its incorporation. At least, it is not clearly foreign to that purpose."

It is said in 4 Thompson on Corporations, § 5642:

"It is but another statement of the principle of the preceding section to say that, although corporations have only such powers as are granted to them in their charters and governing statutes, yet when express power is granted to do a particular act, this carries with it by implication the right to do any act which may be found reasonably necessary to effect the power expressly granted."

Quoting this enunciation by Mr. Thompson with approval, our Supreme Court, in the case of Comanche Cotton Oil Co. v. Browne, 99 Tex. 660, 662, 92 S. W. 450, says:

"Therefore, if one more cotton gin should be found reasonably necessary to the operation of the cotton seed oil mill, the corporation would be authorized to operate such necessary cotton gins. This provision of the charter as it was filed and to which objection is made—'and to erect, own, and operate whatever cotton gins may be necessary and proper as feeders for said oil mill'—confers upon the corporation no power to own and operate any cotton gins which are not necessary to the operation of the cotton seed oil mill."

Applying the principles here announced to the facts of the instant case, it may be said that the University corporation had the power to make, either for itself or for the benefit of any of its correlated or auxiliary schools, a contract reasonably necessary for the promotion of its business or the fulfillment of the purposes for which it was incorporated, provided such contract was not in violation of the law or against public policy. Since the court found that hospital facilities were necessary to give the students of the Medical School the clinical instruction required, we are of the opinion that it was within the corporate powers of the University corporation to make the contract for the rent of a building in which the hospital might be established. Nor do we think that the fact that the students of the Medical School had the privi-

lege and opportunity of visiting other hospitals in the city, in connection with their course in clinics, would determine the matter of the reasonable necessity of providing hospital facilities more directly under the control of members of the faculty of the Medical School such as is here shown in the case of the hospital conducted by the Hospital Association. For it might be said with more force in the cases of Horst v. Lewis and Winterfield v. Brewing Co., supra, that it was not reasonably necessary for the Brewing Company to become surety for the payment of the rent of one of its customers, or one who would thereby become one of its customers, as it could find customers for its products without becoming such surety. But the test here, as there, is whether the act done was in the reasonable and lawful promotion of the purposes and objects for which the corporation was created. The very term "university" implies an institution of many departments, and the building up of one department of the school or the securing of students for one department would naturally and reasonably tend to promote the welfare and growth of other departments and of the institution as a whole. In the case of Succession of Hutchinson, 112 La. 656, 36 South. 639, which involved the construction of a will, it was held that the establishment and maintenance of a clinic and a hospital for the sick was not ultra vires of Tulane University corporation. After quoting a statement of Professor Osler, of the Johns Hopkins University, to wit, "The hospital is the only proper college in which to rear a true disciple of Æsculapius," the opinion goes on to say:

"If, then, a hospital is indispensable to a medical school, can any one in reason say that the authority to establish and maintain a medical school does not include authority to establish and maintain a hospital? A hospital used for such purposes is an educational institution. * * * Realizing the force of the foregoing, the learned counsel for plaintiffs are driven to argue that the Medical Department of Tulane is already sufficiently provided with clinical opportunities by having access to the Charity Hospital, and that, therefore, a hospital is unnecessary, and the establishment and maintenance of one is ultra vires. But that argument can hardly be serious. As well might it be argued that the University has no need of a library of its own because it has access to the Fisk and Howard Libraries."

Without further prolonging this opinion, we hold that in making the lease contract for the building in question, to be used for hospital purposes, and for the benefit of the students of its Medical School, the University was not attempting to perform an act which was ultra vires.

[3] But appellee urges that, irrespective of the question of the University corporation's authority to enter into a contract of the nature shown, that the judgment should be sustained on the ground that appellee, by its sworn answer to appellant's petition, denied that the contract sued upon was authorized by it, or by its duly authorized agents, and that appellant did not controvert said plea in said answer, either by pleadings or proof, and that as the burden was on him to do so, he did not make out his case against appellee, and should not be permitted to recover herein.

Perhaps it is a sufficient answer to this proposition that the court in so many words found, as stated, in his conclusion of law that the instrument was executed by the Texas Christian University, and bases his judgment that the University should not be held liable, not on the theory that the plaintiff had not discharged his burden of proof as to the execution of the instrument, but that the execution of said contract on the part of the University was an effort to lend its credit to and guarantee the debts of the University Hospital Association. The court did find that the lease contract was not authorized by the board of trustees of the defendant, but was authorized by a subcommittee composed of some of the members of said board. J. A. Dacus, at the time of this contract the business manager for the University, and also for the Medical School, testified that the board of trustees of the University consisted of 21 members, living at different portions of the state; that there was a committee known as the executive committee, which was appointed by the president and the board of directors, and which consisted of some 5 to 7 members, and there was a local board composed of local men; that this local board, or executive committee, passed a resolution that he, as business manager, should make the lease, and that Mr. Waites, the secretary of the board of directors of the University, signed the lease with him. The lease itself shows that Mr. Waites as secretary attested the seal and signature of the University, and the evidence further shows that at the time Drs. Saunders and Chase presented the matter to the board of directors of the University, they also asked for a loan of $1,200, and that Mr. Dacus, as business manager, was instructed by the board to secure the money, if possible, and that he did so and took a chattel mortgage on the Hospital Association equipment to reimburse the University for the loan made, and that when the Hospital Association ceased to operate, Dacus, for the University, took possession of said furniture and equipment. The evidence further shows that the University paid, in part, the salaries of certain teachers and professors giving instruction in the Medical School, and that the University leased or provided premises for other departments of the University, to wit, the music department, and the Bright Bible School, and there is nothing in the record to show or intimate that at any time the board of directors as a whole questioned or repudiated the contract made for the lease of this building until the Hospital Association ceased to operate and an effort was made on the part of appellant to enforce the

payment of his rental. Therefore we conclude that the judgment cannot be sustained on the ground contended for by appellee; that is, that there was an absence of proof that the execution of the contract was made under the authority of the University corporation.

Holding, as we do, that the Texas Christian University authorized the execution of the lease contract in question, and that said contract was not ultra vires, it follows that the judgment of the trial court must be reversed, and as the evidence seems to have been fully developed, judgment must be here rendered for appellant, and it is so ordered.

Reversed and rendered.

## On Motion for Rehearing.

[4] The appellee has asked us to find as to the appellant's right to recover attorney's fees. The lease provided:

"It is expressly understood and agreed in case the lessees fail to pay said rents monthly as they become due, and in case of collection of same by suit or otherwise, then lessees shall pay all costs and expenses of collection, including an attorney's fee of 10 per cent. on amount thereof."

Appellant pleaded this provision of the contract, and alleged by reason of the failure of appellee to pay the rental as provided it became liable for 10 per cent. attorney's fees, and that plaintiff had been compelled to institute suit for said rent. The court found that suit was entered to collect said rent. No issue has been raised as to the reasonableness of said 10 per cent. attorney's fees, and even though no proof was offered as to the promise on the part of appellant to pay his attorneys such fee, or that 10 per cent. was a reasonable fee, yet we think appellant was entitled thereto, and that it should be included in the judgment rendered by us. Bank v. Robinson, 104 Tex. 166, 135 S. W. 372; Lanier v. Jones, 104 Tex. 247, 136 S. W. 255; Beckham v. Scott, 142 S. W. 80.

While appellee has filed an able and insistent motion for rehearing which we carefully considered, yet we feel that in our original opinion we properly disposed of the questions presented, and the motion should be overruled; and it is so ordered.